IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 17-cv-1894-WJM-SKC

HAMPDEN AUTO BODY CO.,

     Plaintiff,

v.

OWNERS INSURANCE COMPANY,

     Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION *IN LIMINE* AND
GRANTING PLAINTIFF'S MOTION *IN LIMINE***

---

Before the Court is Owners Insurance Company's ("Owners") Motion *in Limine*. (ECF No. 91.)  Also before the Court is Hampden Auto Body Co.'s ("Hampden") Motion *in Limine*.  (ECF No. 92.)  For the reasons explained below, Owners's Motion *in Limine* is denied, and Hampden's Motion *in Limine* is granted.

## I.  BACKGROUND

Hampden is a family-owned auto body repair shop that was insured under insurance policies issued by Owners that covered business income loss (the "Business Income Policy") and building and personal property loss.  (ECF No. 4 ¶¶ 5–7.)

On May 30, 2014, a lightning strike damaged Hampden's property, including an infrared heat lamp that is used to cure and dry various coatings that are applied to most of the vehicles that Hampden services.  (*Id.* ¶¶ 11–12.)  Following the loss of the paint drying system, the length of time it took Hampden to repair vehicles spiked.  (*Id.* ¶ 15.)

Hampden submitted an insurance claim to Owners.  (*Id.* ¶ 13.)  Hampden

contends that Owners largely ignored its phone calls and e-mails requesting help in repairing its paint drying system over the course of the next year.  (*Id.* ¶¶ 14–37.) During that time, the Denver metro area experienced a number of storms, which led to a surge of work at other auto body shops in the metro area.  (*Id.* ¶¶ 39–45.)  Hampden, however, could not take advantage of the increased demand as a result of the damage caused to the paint drying system.  (*Id.* ¶ 45.)

On September 3, 2015, Hampden's paint drying system was replaced, which restored Hampden to full operational capacity.  (*Id.* ¶ 38.)  On May 4, 2016, Owners determined that Hampden's business loss for the 12-month period following the lightning strike was $221,193, which Hampden contends was far below the actual damages it sustained.  (*Id.* ¶¶ 49–50.)

## II.  LEGAL STANDARDS

"The admissibility of evidence in diversity cases in federal court is generally governed by federal law."  *Blanke v. Alexander*, 152 F.3d 1224, 1231 (10th Cir. 1998). "The admission or exclusion of evidence lies within the sound discretion of the trial court . . . ."  *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1086 (10th Cir. 1994).  *See also United States v. Golden*, 671 F.2d 369, 371 (10th Cir. 1982) ("Trial judges have discretion to decide whether an adequate foundation has been laid for the admission of evidence.").

Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in determining the action."  Relevant evidence is

2

generally admissible and should only be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.

## III.  OWNERS'S MOTION *IN LIMINE* (ECF No. 91)

As an initial matter, it appears Owners seeks to obtain a substantive ruling on the proper interpretation of the Business Income Policy.  Such a determination should have been sought on a motion to dismiss or motion for summary judgment.  *See KRW Sales, Inc. v. Kristel Corp.*, 1994 WL 75522, at *1 (N.D. Ill. Mar. 8, 1994) (recognizing that plaintiff "misuses the motion *in limine*" by seeking a ruling that the contract at issue is unambiguous because "the proper course for seeking a substantive ruling on a contract is a motion to dismiss or for summary judgment"); *Kennedy v. Elec. Ins. Co.*, 2020 WL 1493935, at *4 (S.D. Ga. Mar. 24, 2020) (recognizing that arguments concerning the interpretation of a contract seeks relief which should have been brought via a motion for summary judgment); WJM Rev. Prac. Stand. III. F.1 ("A motion in limine that is a veiled motion for summary judgment may also be denied out of hand.").

Nonetheless, the Court will consider Owners's arguments because the interpretation of an insurance contract is typically a question of law.  *See USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005) (en banc).

### A.    Applicable Law

Under Colorado law, courts construe insurance policies "using general principles of contract interpretation."  *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661

F.3d 1272, 1283 (10th Cir. 2011).  Therefore, absent an ambiguity, a policy's language

is construed according to its plain meaning.  *Id*.  However, in recognition of the unique

relationship between insurer and insured, courts "construe ambiguous provisions

against the insurer and in favor of providing coverage to the insured."  *Id*. at 1284 (citing

*Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003)).

Courts look to the policy as a whole to determine whether an ambiguity is present.

*Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005) (en banc).

Disagreements regarding policy interpretation do not necessarily signal, or create, an

ambiguity.  *Id*.  Rather, "[a]n insurance policy is ambiguous if it is susceptible on its face

to more than one reasonable interpretation."  *Id*.  One may not read an ambiguity into a

term where none exists in order then to resolve the resulting ambiguity against the

insurer.  *See Martinez v. Hawkeye-Security Ins. Co.*, 576 P.2d 1017, 1019 (Colo. 1978)

(en banc) ("[C]ourts will not force an ambiguity in order to resolve it against an

insurer.").

To determine whether a provision is ambiguous, "the instrument's language must

be examined and construed in harmony with the plain and generally accepted meaning

of the words employed, and reference must be made to all the provisions of the

agreement."  *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748,

750 (Colo. 1978) (en banc).  Courts should avoid "strained constructions" in favor of

"common constructions," and technical and legal definitions should also be avoided.

*Dish Network Corp. v. Arch Specialty Ins. Co.*, 989 F. Supp. 2d 1137, 1144 (D. Colo.

2013).  "In other words, the plain meaning of the words should be employed in a lay

manner consistent with what would be understood by a person of ordinary intelligence." *Id.*

## B.    Dr. Bernstein's Opinions Regarding Lost Business Income

Owners argues that the business loss income opinions of Dr. Asaf Bernstein, Hampden's expert witness, are irrelevant and should be excluded because he calculated Hampden's loss contrary to the terms of its insurance policy.  (ECF No. 91 at 2–6.)

Under the Business Income Policy, Owners agreed that "[s]ubject to the Limit of Insurance provisions of this endorsement, [Owners] will pay for the actual loss of Business Income [Hampden] sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration.'"  (ECF No. 91-2 at § 1(a).)   The Business Income Policy defines Business Income in the following manner:

> Business Income means the:
>
> > (1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
> >
> > (2) Continuing normal operating expenses incurred, including payroll.

(*Id.*)  Moreover, the Business Income Policy provides that the amount of Business Income Loss will be determined based on:

> (a)    The Net Income of the business if no loss or damage occurred;
>
> (b)    The likely Net Income of the business if no loss or damage occurred;
>
> (c)    The operation expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct

5

physical loss or damage; and

(d)     Other relevant sources of information, including:

      (1)     Your financial records and accounting procedures;

      (2)     Bills, invoices and other vouchers; and

      (3)     Deeds, liens or contracts.

(*Id.* at § 3(d)(1).)

Owners argues that the calculation of the net income of the business if no loss or damage occurred "focuses on likely net income as of the date of loss." (ECF No. 91 at 3.) It contends that Dr. Bernstein's opinions regarding business income loss—which factor in a boost in business income that Dr. Bernstein believes that Hampden would have earned from significant storms in 2014—are irrelevant because they are contrary to the policy language. (*Id.* at 5 ("Without the severe weather, there is no loss or damage, and the 'substantial boost' to Hampden's business described by Dr. Bernstein does not exist.").)

In response, Hampden argues that Dr. Bernstein's opinions regarding Business Income Loss are consistent with the policy language and are therefore admissible. (ECF No. 121 at 1.) The Court agrees.

Although Owners contends that the calculation of Business Income Loss "focuses on likely net income as of the date of loss" (ECF No. 91 at 3), the Business Income Policy does not specify that the calculation of the net income of the business is a retrospective determination. Instead, the phrase "Net Income of the business if no loss or damage occurred" leaves open the possibility that Business Income Loss could include increased economic opportunities that arise after the date of the loss. Had

6

Owners wanted to constrain the calculation of business income to a retrospective inquiry, it could have specified as much in the Business Income Policy using clear and unequivocal language.  It did not do so.[1]

To be clear, other courts have rejected arguments that parties are entitled to increased profits under business income policies as a result of increased economic opportunities caused by the same event that damaged the insured's operations.  *See, e.g.*, *Am. Auto Ins. v. Fisherman's Paradise*, 1994 WL 1720238, *4 (S.D. Fla. Oct. 3, 1994) ("had no hurricane occurred . . . , [then] neither would the claimed earnings source"); *E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1078 (3d Cir. 1980) ("we believe it is apparent that the policy makes no provision for recovery of an expense which is newly created by the interruption"); *Prudential LMI Commercial v. Colleton Enters., Inc.*, 1992 WL 252507, at *4 (4th Cir. Oct. 5, 1992) (rejecting business interruption profit calculations incorporating estimated profits from the influx of temporary residents-relief workers from the same hurricane that damaged the insured motel).  Such cases, however, are distinguishable from the present case because Dr. Bernstein's opinions regarding increased business demand are tied to a number of subsequent storms in 2014—and not just the May 30, 2014 storm that caused the interruption to Hampden's paint drying system.[2]

_____

[1]  Owners also argues that "because Dr. Bernstein's calculation[s] are outside the scope of the insurance contract, they are a calculation of consequential damages," which are outside of the scope of the contract.  (ECF No. 91 at 6 (citing ECF No. 91-4 at 2).)  The Court is not persuaded.  As set forth above, Dr. Bernstein's calculation of damages comports with the plain language of the insurance contract.

[2]  Owners does not dispute that there were a number of significant storms in 2014, including a hail storm in September 2014.  (ECF No. 121-1.)  Dr. Bernstein's report shows that the severe weather and hail repair orders spiked significantly after September 2014.  (ECF No.

Accordingly, because Dr. Bernstein's opinions regarding Hampden's business income loss comport with the Business Income Policy language, the Court denies Owners's request to exclude such testimony.[3]

**C.    Evidence Regarding Business Income Loss over 15-Month Period**

The terms of the Business Income Policy provides that Owners

> will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration" and necessary Extra Expense you incur during the "period of restoration" that occurs within 12 consecutive months after the date of direct physical loss of or damage to property at the described premises or at a "newly acquired location," including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

(ECF No. 91-2 at § 2(c).)  It also defines "Period of Restoration" as

> [T]he period of time that:
>
> a.    Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises or at a "newly acquired location"; and
>
> b.    Ends on the date when the property at the described premises or at a "newly acquired location" should be repaired, rebuilt or replaced with reasonable speed and similar quality."
>
> . . .
>
> The expiration date of this policy will not cut short the "period of restoration."

---

91-3 at 7.)

[3]  For the reasons set forth above, the Court also denies Owners's request to exclude testimony and evidence from Hampden representatives about its business income loss.  (ECF No. 91 at 6–7.)

(*Id.* at § 4.)

Owners seeks to exclude Dr. Bernstein's opinions regarding Hampden's business income losses over a 15-month period.  (ECF No. 91 at 7.)  In particular, it argues that Dr. Bernstein's opinions about Hampden's 15-month business income losses are not probative to any material fact because Hampden's Business Income Policy unambiguously limits recovery to 12 months.  (*Id.* at 7–8.)  The Court disagrees.

Although the declarations indicate that the Business Income Policy is a 12-month policy (*see* ECF No. 91-6), the policy language explicitly provides that the "period of restoration" may extend beyond the expiration of the policy.  (*See* ECF No. 91-2 at § 4 (**"**The expiration date of this policy will not cut short the 'period of restoration.'").)  Thus, because it took Owners 15 months to repair Hampden's paint drying system, the "period of restoration" is 15 months.

Owners argues that notwithstanding the definition for the "period of restoration," Section 2(c) of the Business Income Policy limits recovery of lost business income to 12 months.  (ECF No. 91 at 7.)  This interpretation is inconsistent with the plain language of the Business Income Policy, which provides that Owners would pay for the loss of business income sustained "due to the necessary suspension of your 'operations' during the 'period of restoration' and necessary Extra Expense you incur during the 'period of restoration' that occurs within 12 consecutive months after the date of direct physical loss." (ECF No. 91-2 at § 2(c).)  In other words, Owners agreed to pay for the loss of business income sustained during the entire period of restoration but would only

pay the Extra Expense incurred within 12 months.[4]  This interpretation comports with Section 1(a) of the Business Income Policy, which also does not include a 12-month limitation on Owners's obligation to pay for Hampden's lost business income during the "period of restoration."  (ECF No. 91-2 at § 1(a) ("we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'").)[5]

Accordingly, the Court denies Owners's request to exclude evidence regarding Hampden's business income loss over a fifteen month period.

**D.    Evidence About Replacing Hampden's Paint Drying System**

Under the Building and Personal Property Coverage Form, Owners agreed that "[i]n the event of loss or damage covered by this Coverage Form, at our option," it would:

> (1)    Pay the value of the loss or damaged property;
>
> (2)    Pay the cost of repairing or replacing the lost or damaged property;
>
> (3)    Take all or any part of the property at an agreed or appraised value; or

---

[4]  The repetition of "period of restoration" in the sentence leads the Court to conclude that the phrase "that occurs within 12 consecutive months after the date of direct physical loss" only modifies "necessary Extra Expense you incur during the 'period of restoration.'"

[5]  Moreover, if the Court accepted Owners's argument that recovery for *both* business income and extra expenses is limited to losses incurred within 12 months of the direct physical loss, the contractual provision stating that "[t]he expiration date of this policy will not cut short the 'period of restoration'" could be rendered meaningless.  Owners's proposed reading of the Policy is therefore inconsistent with contract construction principles.  *See Martinez v. Am. Family Mut. Ins. Co.*, 413 P.3d 201, 203 (Colo. App. 2017) (recognizing that courts "read the provisions of the policy as a whole, construing the policy so that all provisions are harmonious and none is rendered meaningless").

(4)     Repair, rebuild or replace the property with other property of like kind and quality.

(ECF No. 91-7 at 7.)

Owners contends that Hampden should be excluded from introducing evidence about replacing Hampden's paint drying system.  (ECF No. 91 at 8.)  In particular, it argues that because it ultimately paid for the cost of *repairing* Hampden's system, "[e]vidence about *replacing* Hampden's paint drying system, including estimates of replacement cost, is irrelevant because it does not make the existence of any fact of consequence to the determination of this action more or less probable."  (ECF No. 91 at 9.)

Part of Hampden's theory of its case is that Hampden engaged in substantial efforts to procure a replacement paint drying system while Owners engaged in dilatory conduct.  (ECF No. 121 at 4.)  Thus, regardless of whether Owners ultimately paid to repair Hampden's system, Hampden's efforts to procure a replacement paint drying system are relevant to whether Owners acted in bad faith.

Accordingly, the Court denies Owners's request to exclude evidence regarding Hampden's efforts to procure a replacement system.

**E.     Dr. Bernstein's Opinions**

Owners seeks to exclude evidence regarding Dr. Bernstein's report, which was created and disclosed after Hampden filed this lawsuit.  (ECF No. 91 at 9.)  It argues that the report is irrelevant to Hampden's extra-contractual claims because an insurer's bad faith must stem from the information before the insurer at the time of its decision. *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 878 (Colo. 2018) (recognizing that "[a]n

11

insurer's decision to deny benefits to its insured must be evaluated based on the information before the insurer at the time of that decision"). According to Owners, because its alleged bad faith "cannot be based on a report that did not exist at that time . . . Dr. Bernstein's opinions are irrelevant to Hampden's bad faith and statutory claims." (ECF No. 91 at 9–10.)

Prior to filing this lawsuit, Hampden informed Owners that it believed it could have generated substantially more revenue than Owners had calculated. (ECF No. 121-10.) Thus, the introduction of Dr. Bernstein's opinions goes directly to Hampden's initial contention that Owners was undervaluing its insurance claim. *Cf. Peiffer v. State Farm Mutual Auto. Ins. Co.*, 940 P.2d 967 (Colo. App. 1996) (holding insurer could present expert testimony of neuropsychologist that was retained after the lawsuit was filed because "the insurer was not seeking to create new evidence to justify a previous benefits decision" but instead "was seeking to introduce an expert's opinion on evidence that existed before the insurer made its decision"); *Palmer v. Owners Ins. Co.*, 2019 WL 7290935, at *3 (D. Colo. Nov. 6, 2019) (allowing Owners to introduce expert to show that it was reasonable to rely on medical records created before the lawsuit in denying insurance coverage).

Moreover, although the reasonableness of Owner's calculation of Hampden's benefits is evaluated based on information that Owners had at the time, information gained after Owners's decision is still relevant to Owners's duty to act in good faith. *See Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010) ("This duty of good faith and fair dealing continues unabated during the life of an insurer-insured relationship, *including through a lawsuit or arbitration between the*

12

*insured and the insurer*, although the adversarial nature of such proceedings may

suspend the insurer's obligation to negotiate as a reflection of good faith." (emphasis

added)).

Accordingly, the Court denies Owners's request to exclude Dr. Bernstein's

opinions.

### IV.  HAMPDEN'S MOTION *IN LIMINE* (ECF No. 92)[6]

Hampden's claim of unreasonable delay/denial relies on Colorado Revised

Statutes §§ 10-3-1115 and -1116.  The latter section permits a statutory penalty against

the insurer of "two times the covered benefit."  Colo. Rev. Stat. § 10-3-1116(1).

Hampden asks that Owners be prohibited from informing the jury of this penalty.  (ECF

No. 92 at 3.)

In response, Defendant argues that "[e]vidence of potential statutory damages is

relevant to understanding the circumstances and events surrounding Hampden's

claims."  (ECF No. 102 at 2.)  In particular, it argues that such evidence is relevant

"because it shows the motive Hampden might have had to delay resolution of the claim,

withhold information from Owners, not cooperate in Owners'[s] investigation, and to fail

to mitigate its damages" and that Hampden's failure to cooperate was "not a mistake or

accident."  (*Id.* at 2–3.)  The Court disagrees.

---

[6]  The introductory paragraph to Hampden's Motion *in Limine* states that it seeks to
exclude evidence of "attorney communications, 1115/1116 Penalties, and Non-Cooperation."
(ECF No. 92 at 1.)  Because Hampden's Motion does not further discuss its request to exclude
evidence of attorney communications and/or non-cooperation, the Court finds that Hampden
has waived these requests for failure to meaningfully develop them.  *See United States v.
Martinez*, 518 F.3d 763, 768 (10th Cir. 2008) ("But this contention appears only in a fleeting
sentence at the conclusion of Mr. Martinez's opening brief, supported by no analysis or citation;
without any such development, our precedent instructs us to deem the point waived and leave
any such challenge for another day.").

13

To begin, the statutory penalty is not relevant to the jury's deliberations.[7]  The jury need only determine the amount of the delayed or denied benefit.  The addition of the penalty is a matter solely for the Court to determine when drafting the judgment.  *See Cassareto v. GEICO Cas. Co.*, 2017 WL 7693513, at *2 (D. Colo. May 26, 2017) ("[T]he Court agrees statutory penalties are not relevant to the issues the jury must decide."); *Seidman v. Am. Family Mut. Ins. Co.*, 2016 WL 8201768, at *3 (D. Colo. Sept. 13, 2016); *Toy v. Am. Family Mut. Ins. Co.*, 2014 WL 486173, at *1 (D. Colo. Feb. 6, 2014).  Moreover, discussion of the penalty "may tend to confuse or prejudice a jury into reducing its eventual award."  *Toy*, 2014 WL 486173, at *1 (internal quotation marks omitted); *Slavin v. Garrison Prop. & Cas. Ins. Co.*, 805 F. App'x 561, 570 (10th Cir. 2020) (recognizing that "courts have recognized a policy against informing juries of . . . damages-multiplying provisions on the ground that juries so informed might decrease the damages award or find no liability based not on the evidence but on whether the defendant deserves to be penalized and the plaintiff so rewarded").

Accordingly, Hampden's Motion *in Limine* is granted.  Owners is prohibited from introducing testimony, exhibits, or argument regarding the penalty imposed by § 10-3-1116(1).

## V.  CONCLUSION

For the reasons set forth above, Defendant's Motion *In Limine* (ECF No. 91) is DENIED, and Plaintiff's Motion *In Limine* (ECF No. 92) is GRANTED.

---

[7]  Even without introducing evidence regarding potential statutory penalties, Owners can still argue that Hampden delayed resolution of its claim, withheld information from Owners, or failed to cooperate in Owners's investigation.

14

Dated this 5th day of November, 2020.

BY THE COURT:

William J. Martinez
United States District Judge